**ALLIANT TECHSYSTEMS INC., ATK Aerospace Group, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–20C.

United States Court of Federal Claims.

Jan. 4, 2007.

Thomas A. Lemmer, McKenna Long & Aldridge LLP, Denver, Colorado, for plaintiff. Steven M. Masiello, McKenna Long & Aldridge LLP, Denver, Colorado, and Michael L. Bell, Alliant Techsystems Inc., Salt Lake City, Utah, of counsel.

C. Coleman Bird, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, all of Washington, D.C., for defendant. Major Kevin Robitaille, Department of the Army, Arlington, Virginia, of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

The plaintiff, Alliant Techsystems Inc., ATK Aerospace Group, successor-in-interest to Thiokol Propulsion ("ATK/Thiokol"), filed this suit seeking to recover $2,722,709 of post-retirement benefit costs. These costs were incurred during fiscal years 1996 and 1997 and were due to benefits earned by the employees of ATK/Thiokol during its operation of government-owned, contractor-operated facilities. The government argues that these costs were included among those released in a 1997 settlement agreement between the parties that ended two prior suits in this Court, and ATK/Thiokol counters that this settlement excluded these particular costs. Each party has moved for summary judgment, based on their respective interpretations of the settlement agreement. The Court has concluded that the settlement agreement released the government from liability for these costs, and, as explained below, GRANTS the government's motion for summary judgment and DENIES ATK/Thiokol's cross-motion for partial summary judgment.

## I. BACKGROUND

During World War II, the United States Army constructed two plants, the operation of which has given rise to the claims in this case—the Longhorn Army Ammunition Plant ("AAP") and the Louisiana AAP. Pl.'s Ex. 4 (Sett.Agmt.) ¶ 1, Pl.'s App. at 87. ATK/Thiokol operated the Longhorn AAP for the government from September 25, 1952 until June 30, 1997, and the Louisiana AAP from December 31, 1975 until June 30, 1997. Sett. Agmt. ¶¶ 2–3, 23, Pl.'s App. at 87, 90. These plants were initially run pursuant to government-owned, contractor-operated ("GOCO") contracts, under which the operator's costs were reimbursed by the Army. Sett. Agmt. ¶¶ 2–4, 14, Pl.'s App. at 87, 89. The parties switched to a facilities contract for Longhorn AAP effective October 1, 1993, but retained the cost-reimbursement regime. See Sett. Agmt. ¶ 11, Pl.'s App. at 88; Pl.'s Ex. 2 (Aldredge Decl.) ¶ 14, Pl.'s App. at 29–30. Because of reduced Army demand for the products of these plants, the cost-reimbursement contracts were terminated and replaced with fixed-price facilities use contracts, beginning July 1, 1995. See Sett. Agmt. ¶¶ 12, 14, Pl.'s App. at 88–89; Aldredge Decl. ¶ 19, 33–35, Pl.'s App. at 30–31, 35–37; Def.'s App. at 26 (Adams Decl.) ¶ 2; see also Def.'s Resp. to Pl.'s Prop. Findings ¶¶ 10, 18–19.

### A. ATM/Thiokol Establishes Employee Benefits

In the 1970s, ATK/Thiokol augmented the fringe benefits it had traditionally provided to its employees. Long–Term Disability Benefits ("LTDBs") were extended to its Longhorn AAP workers in 1970. Sett. Agmt. ¶ 5, Pl.'s App. at 87. Post-retirement health care benefits ("PRBs") were offered to these employees starting in 1972. Id. ¶ 6, Pl.'s App. at 88. When plaintiff assumed operation of the Louisiana AAP in 1975, it provided LTDBs and PRBs to those employees, as well. Id. ¶¶ 5–6, Pl.'s App. at 87–88. And it provided Workers' Compensation Insurance ("WC") to its employees as required by the relevant states' laws. Id. ¶ 7, Pl.'s App. at 88. Under the accounting conventions of the time, ATK/Thiokol did not accrue or pre-fund its liabilities for these benefits, but paid them as they came due, and was reimbursed by the Army on the same pay-as-you-go basis. Id. ¶ 8, Pl.'s App. at 88.

Under the pay-as-you-go approach, all benefits earned by ATK/Thiokol employees working on the Army contracts would one day be paid for by the Army—if the contracts were never to end. Unfortunately for the plaintiff, unlike government programs and agencies which have been said to last forever,[1] public contracts are not as permanent, and the need for the product manufactured at these facilities ultimately evaporated. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶¶ 10, 26–27. By the early 1990s, coincident with its reduced demand for these products, the Army determined that fringe benefits such as PRBs should not be directly charged to contracts. Instead, the Army believed that such costs should be included in the "Payroll Related Costs" pool of expenses that are indirectly reimbursed. *See* Pl.'s Ex. 11 (Sept. 15, 1994 audit report of Defense Contract Audit Agency), Pl.'s App. at 429. As indirect costs in an overhead pool, they would be allocated according to the proportion of ATK/Thiokol's work on the two Army contracts relative to ATK/Thiokol's total operations. Up until that point, it would not have mattered whether these costs were reimbursed directly or indirectly through the overhead pool, as the Army's Contracting Officer ("CO") for the two plants concedes that "ATK/Thiokol's GOCO contract work represented nearly the entire allocation base." Def.'s Supp.App. at 507 (Adams Supp. Decl.) ¶ 4. But as the Army's demand for the products of these plants fell, the corresponding ratio of the Army contracts to the total business base of ATK/Thiokol also dropped. This resulted in the Army acknowledging responsibility for only a fraction of the costs of these fringe benefits that ATK/Thiokol's employees had earned while they were working on the Army contracts.

An additional complication for ATK/Thiokol was the Financial Accounting Standards Board's determination that employers should use the accrual method for fringe benefits like PRBs. This pronouncement, contained in Statement of Financial Accounting Standards No. 106 (FAS 106), was issued in December 1990, and became mandatory for fiscal years beginning after December 15, 1992. To facilitate compliance with FAS 106 and the necessary transition, ATK/Thiokol split its PRB liabilities into two distinct plans. For employees retired before February 1, 1993, plaintiff continued to bill the Army on a pay-as-you-go basis. For all other employees or retirees, ATK/Thiokol began accruing benefits as they were earned—which it called "current service" liabilities—and also started to phase-in recognition of the benefits that had already been earned, which were referred to as "prior service" liabilities.[2] *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 7; Pl.'s Ex. 16 (Aug. 31, 1995 Request for Increased Funding), Pl.'s App. at 491; Pl.'s Prop. Findings, ¶ I(C)-(D).

ATK/Thiokol thus incurred costs relating to "prior service" liabilities in two forms: the costs of liquidating PRBs earned by the pre-February 1, 1993 retirees, in the form of payments for their health insurance premia and the like;[3] and the costs of amortizing the benefits earned by employees who had not retired by that date. Notwithstanding the Army's reduced demand for the products of these AAPs, the "prior service" costs would have been fully reimbursed by the Army, even under the indirect method of including them in the overhead cost pool, so long as the Army contracts were the entire base of business to which these were allocated. But the Army encouraged ATK/Thiokol to attract commercial business to the facilities, in order to help spread overhead costs. The Army's decision to include the costs of funding "prior service" PRB liabilities in the overhead cost pool, however, made it difficult for ATK/Thiokol to attract commercial customers, and plaintiff persisted in raising the issue of these costs. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 16.

---

1. *See* RONALD REAGAN, A TIME FOR CHOOSING 50 (1983) ("A government agency is the nearest thing to eternal life we'll ever see on this earth.") (October 27, 1964 nationally-televised speech).

2. These costs were amortized on a twenty-year basis. *See* Pl.'s Ex. 16, Pl.'s App. at 485 n. 9, 486.

3. *See* 48 C.F.R. § 31.205–6(*o*)(1) (explaining benefits encompassed by PRBs).

## B. ATK/Thiokol Requests Funding for the PRBs

In December 1994, ATK/Thiokol and the government agreed to negotiate fixed-price facilities use contracts for both the Longhorn and Louisiana plants. Sett. Agmt. ¶ 12, Pl.'s App. at 88. When these contracts were negotiated during the spring of 1995, the parties agreed to "set aside" the issue of the unfunded PRB benefits earned by the employees working under the GOCO contracts. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 18. The facilities use contracts that were executed provided:

> The parties agree that costs associated with contracts effective on or after 1 July 1995, shall not include any costs associated with close-out of [the GOCO contracts] (these costs include but are not limited to costs of post retirement benefits related to employees who retired prior to 1 February 1993 . . .). These costs shall be separately accumulated and billed to the Government by the Contractor. These prior contracts shall remain open for administrative purposes until all costs associated with their performance have been paid, or until such time as the Government's obligation, if any, to pay such costs, in the manner described herein, is transferred to a successor contract.

Def.'s App. at 429 (Modification No. P00001 to Longhorn AAP facilities use contract). ATK/Thiokol took this language to mean that funding to cover the PRBs already earned by its AAP employees should be sought under the GOCO contracts. Accordingly, on August 31, 1995, it submitted a request for "interim funding" of $5,920,875 under the GOCO contracts, to cover the PRB, LTDB, and WC costs incurred from July 1, 1995 through June 30, 1996. *See* Pl.'s Ex. 16, Pl.'s App. at 478–80. Plaintiff also included a proposed "Advance Agreement" that would create a trust fund to finance PRBs after the GOCO contracts were closed out. *See id.* at 496–97. The present value of those future, already-earned benefits was calculated to be $32,456,713 as of June 30, 1996. *See id.* at 480. When the government had not acted on the request for interim funding by late November 1995, ATK/Thiokol submitted a second request for interim funding, seeking reimbursement of the expenses incurred in the first four months of that fiscal year. *See* Pl.'s Ex. 17 (Nov. 27, 1995 Request for Interim Funding).

Both requests were denied by the CO on December 13, 1995. Pl.'s Ex. 19. She based this denial on her determination that the "appropriate means of allocating such costs is to the current business base, including commercial work." *Id.* Thus, because the plaintiff wanted the Army to pay the full cost of the PRBs earned by employees while working on Army contracts, the request was rejected. The next month, ATK/Thiokol submitted a certified claim under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–13, seeking $38,377,588—the sum resulting from the combination of the initial interim funding request and the Advance Agreement amount. Pl.'s Ex. 22; Sett. Agmt. ¶ 17, Pl.'s App. at 89. The sum claimed thus reflected "the present value of the accrued liabilities as of June 30, 1995." Pl.'s Ex. 22, Pl.'s App. at 516; *see also* Sett. Agmt. ¶ 17, Pl.'s App. at 89. The CO denied this claim "in its entirety" on June 13, 1996. Pl.'s Ex. 29, Pl.'s App. at 591. Two other certified claims submitted by the plaintiff—one for reimbursement of PRB costs incurred from October 1, 1993 through June 30, 1994 for retirees from the Longhorn AAP, *see* Pl.'s Ex. 23, and another for reimbursement of severance costs incurred at both AAPs, *see* Def.'s App. at 95–101—were also denied by the CO, in May and June 1996. Pl.'s Ex. 28; Def.'s App. at 114–15; Sett. Agmt. ¶¶ 18–22, Pl.'s App. at 89–90. In letters dated June 19, 1996, the Army informed plaintiff that it would terminate the contracts for the two AAPs as of June 30, 1997. *See* Pl.'s Exs. 30 & 31; *see also* Sett. Agmt. ¶ 23, Pl.'s App. at 90.

## C. The Prior Lawsuits are Filed in Our Court

In July 1996, plaintiff filed a complaint in this Court seeking to recover the amounts identified in the three CDA claims described above. Def.'s App. at 116–51 (Complaint, *Thiokol Corp. v. United States*, No. 96–422C (*"Thiokol I"*)); *see also* Sett. Agmt. ¶ 25, Pl.'s App. at 90. The next month, a fourth CDA

claim, seeking additional severance costs for former AAP employees, was denied by the CO. Sett. Agmt. ¶ 22, Pl.'s App. at 89–90. This claim was the subject of a second complaint, filed in our Court the next year. Def.'s App. at 152–75 (Complaint, *Thiokol Corp. v. United States*, No. 97–541C (*"Thiokol II"*)); *see also* Sett. Agmt. ¶ 26, Pl.'s App. at 90. In *Thiokol I*, plaintiff sought "payment for those benefit costs at the GOCO plants that remain unpaid by the Army." Def.'s App. at 116. These were described as "principally the costs for" PRBs. *Id.* Among these costs was "the amount of $38,377,588," which was "based on the present value amount, as of June 30, 1995, of PRB, LTDB, and WC benefit costs incurred as a result of Thiokol's long term operation of the GOCO plants." *Id.* at 119, 137 (Compl.¶¶ 4, 130). Thus, the plaintiff based its claim in *Thiokol I* upon, among other things, its estimate of the present value of "past" or "prior" service PRB, LTDB, and WC benefits earned by its employees,[4] measured as of June 30, 1995— the same claim included in the request for increased funding and for an Advance Agreement, *see* Pl.'s Ex. 16, Pl.'s App. at 480 (showing the interim funding for year beginning July 1, 1995, and the present value of benefits owed after June 30, 1996, combine to total $38,377,588), and in the initial CDA claim submitted to the CO. *See* Pl.'s Ex. 22, Pl.'s App at 516, 524 (seeking same amount); *see also* Def.'s App. at 137, 141 (Compl. ¶¶ 130–31, 158 (combining the January 16 and 17, 1996 CDA claims)).[5]

In the spring of 1997, the parties began to discuss the possibility of settling the claims at issue in the first lawsuit. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 34. With the Army's termination of the facilities use contracts for the Longhorn and Louisiana AAPs, ATK/Thiokol decided to end its operations in this business line, known as its "Ordnance Operations." *See* Sett. Agmt. ¶ 24. Plaintiff's two pension plans were overfunded, and ATK/Thiokol discovered that the Ordnance Operations employees' share of the assets and liabilities of these plans resulted in a positive balance of approximately $40 million, which it proposed to use as the foundation for a settlement. *See* Pl.'s Ex. 32, Pl.'s App. at 604. According to its initial estimates, if it were allowed to merge the two pension plans, segregate the Ordnance Operations portions, and use the Ordnance Operations surplus toward the satisfaction of the unfunded PRBs, LTDBs, and WC liabilities (but not the severance costs), plaintiff could cover all but $3.5 million of these liabilities. *See id.* at 595, 598, 604. Apparently, the Department of Defense had the authority to approve this merger of pension plans, and the government would normally have a claim to a portion of pension fund surpluses generated in the performance of government contracts. *See* Sett. Agmt. ¶¶ 30, 32.

Taking a closer look at the numbers, ATK/Thiokol determined that if, rather than charging the Ordnance Operations segment of the resulting pension fund the full present value of annual administration costs up-front, it instead delayed recognition of fifty-one percent of these costs, the Ordnance Operations pension fund surplus would "exactly offset[ ] the full amount of the Ordnance Operation PRB, LTDB, and WC liabilities." Pl.'s Ex. 33, Pl.'s App. at 613. A meeting was set for September 4, 1997, at which representatives of ATK/Thiokol and the government could discuss final settlement details, including the prospect of including the severance costs in a settlement. *See id.* at 612, 617–18. Up to that point, in calculating whether the pension plan overfunding would cover the costs of providing the PRB, LTDB, and WC benefits earned by the Ordnance Operations employees, ATK/Thiokol had

---

4. Plaintiff uses both "past service" and "prior service" to denote the liabilities that arose from benefits earned in previous years by its employees, and the costs of liquidating or recognizing these. *See, e.g.,* Pl.'s Prop. Findings, ¶ I(C), (E); Aldredge Decl. ¶¶ 19, 33, Pl.'s App. at 31, 35–36; Pl.'s Ex. 42, Pl.'s App. at 912 (Compl.¶ 36); Meagher Decl. ¶ 4, Pl.'s App. at 69.

5. Owing to an apparent typographical error, plaintiff in *Thiokol I* requested reimbursement of $39,896,391, although the sum of its CDA claims for PRB, LTDB, WC and severance costs was in actuality $39,896,931. *Compare* Def.'s App. at 137 (Compl.¶¶ 130–32) (claims totaling $39,896,931), 146 (Compl.¶ 194) (claim calculated to be $39,896,931) *with id.* at 146–50 (Compl.¶¶ 196, 203, 212–13, 221–22) (using figure of $39,896,391).

been using a figure representing the present value of PRBs to be paid after June 30, 1997. *See* Pl.'s Ex. 32, Pl.'s App. at 604; Def.'s App. at 269, 286. This figure did not take into account the costs incurred in paying or amortizing prior service benefits during the two prior fiscal years.

At the September 4, 1997 meeting, representatives of ATK/Thiokol informed the government that, when running the numbers for the settlement, it had omitted the costs incurred by its Ordnance Operations in paying or funding PRBs in fiscal years 1996 and 1997, and that these costs totaled roughly $8.2 million. *See* Meagher Decl. ¶¶ 23–24, Pl.'s App. at 77–79; Adams Decl. ¶¶ 10–11, Def.'s App. at 28–29; Anikeeff Decl. ¶¶ 13, 15, Def.'s App. at 38–39; *see also* Def.'s Resp. to Pl.'s Prop. Findings ¶¶ 43–44. Plaintiff revisited its numbers, and in mid-November reported to the government that "further review and refinement of the number has resulted in a decrease" in "the incurred, pre-July 1, 1997 post retirement benefit ('PRB') costs," from "$8.2 million identified at the September 4 meeting" down to $6,055,692. *See* Pl.'s Ex. 34, Pl.'s App. at 625. According to ATK/Thiokol:

> The reduction in the final number for these incurred, but non-reimbursed, PRB costs opens up an opportunity for the settlement of all currently known liabilities at the GOCO plants, including the present workers' compensation liability and severance liability. Including workers' compensation and severance among the liabilities offsetting the pension surplus results in a bottom line agreement that will have Thiokol contributing to the settlement in approximately the same amount as was agreed upon at our meeting on September 4 in Ogden.

*Id.* Plaintiff submitted with this letter "supporting backup" for its costs calculations, *id.*, which consisted of a twenty-two-page excerpt from a much longer document. *See* Pl.'s Ex. 35 Tab 4, Pl.'s App. at 662–83; *see also* Def.'s App. at 178–97.[6] The longer document, which the parties refer to as the "PRB Re-

cap," was also submitted to defendant's representatives on that date. Def.'s Resp. to Pl.'s Prop. Findings ¶ 62; *see also* Pl.'s Ex. 5 (PRB Recap), Pl.'s App. at 108–396.

## D. The Prior Lawsuits are Settled

On December 3, 1997, plaintiff submitted a formal, final settlement proposal. Pl.'s Ex. 35. In this letter, it explained that it "claim[ed] that the Army is liable to Thiokol for the reimbursement of $48,975,239 in unpaid" PRB, LTDB, WC and severance "liabilities that arose on or prior to June 30, 1997." *Id.*, Pl.'s App. at 627. Plaintiff proposed to settle these claims by offsetting the liabilities with the pension surplus attributable to the Ordnance Operations, which totaled $46,740,053. *Id.* It stated that its use of the pension assets and its "willingness to absorb over $2 million in the remaining unfunded liability as a compromise to achieve settlement, eliminates any need for the Army to expend current year funds or to seek additional or reprogrammed funds from Congress." Pl.'s Ex. 35, Pl.'s App. at 629. Cost data was enclosed, including "the summary cost data back up for the incurred but unreimbursed PRB costs and the cost data for future PRB costs." *Id.* With this offer, "Thiokol propose[d] to reach a final settlement on the four categories of liability (PRB, LTDB, severance, and workers' compensation) relating to the GOCO plants, with the exception of incurred, but presently unknown workers' compensation claims." *Id.*

This last point was underscored by language in a letter sent by plaintiff's counsel to government counsel twelve days later, which explained that a proposed release:

> does not cover any liabilities other than the four types of liability expressly covered by the settlement agreement: post retirement benefits, long-term disability benefits, severance payments, and workers' compensation benefits, exclusive of benefit plan administrative costs. Thus, for example, environmental cleanup claims or third-party tort claims are not addressed by the settlement and not covered

---

6. The copy of this document included as part of an attachment to the December 3, 1997 letter in the plaintiff's appendix contains two pages that

are omitted from defendant's appendix. *See* Pl.'s Ex. 35 Tab 4, Pl.'s App. at 682–83.

by the settlement agreement's release. These other types of claims, as with the workers' compensation claims expressly excepted out of the settlement agreement, will be addressed by the release negotiated at contract close out.

Pl.'s Ex. 36, Pl.'s App. at 791–92.

The language of the documents needed for settlement was then finalized and, on December 30 and 31, 1997, the parties executed the Settlement Agreement. Def.'s Resp. to Pl.'s Prop. Findings ¶ 75; *see also* Pl.'s Ex. 4, Pl.'s App. at 95; Def.'s App. at 9. The preamble to the Settlement Agreement stated that the agreement was "[f]or the purpose of disposing of all claims relating to the subjects of the complaints in" the two Thiokol cases. Sett. Agmt., Pl.'s App. at 87. The agreement explained that the parties:

> entered into negotiations intended to resolve all of Thiokol's claims regarding PRB Costs and Severance Pay, including both those that had been asserted in cases nos[.] 96–422C and 97–541C and also any other claims or potential claims regarding PRB Costs and Severance Pay that may have arisen from Thiokol's performance under the GOCO contracts and facilities use contracts at the Longhorn and Louisiana AAPs.

*Id.* ¶ 27, Pl.'s App. at 90.[7] This paragraph concluded by noting, "Thiokol has calculated the value of all such known claims regarding PRB Costs and Severance Pay to be $48,915,749." *Id.* The Settlement Agreement identified the Ordnance Operations pension fund surplus to be $46,740,053, *id.* ¶ 29, Pl.'s App. at 91, and explained, "Thiokol projects that the equitable share that it would be required to refund to the United States if it were to terminate the pensions plans amounts to approximately $9.6 million." *Id.* ¶ 30, Pl.'s App. at 91. It was also noted that defendant "desires to resolve Thiokol's claims for PRB Costs and Severance Pay without the potential need to expend current year funds or to seek additional funding." *Id.* ¶ 31.

The Settlement Agreement described the ATK/Thiokol settlement proposal as entailing the government's agreement "to relinquish its right to receive a refund or credit for its equitable share of the pension surplus attributable to the Ordnance Operations" and to authorize the merger of the two pension plans. *Id.* ¶ 32(A), Pl.'s App. at 91–92. For its part, plaintiff would agree "to offset the pension fund surplus of $46,740,053 attributable to the Ordnance Operations against an equal value of its claims for PRB Costs and Severance Pay" and "to absorb the $2,175,696 balance of those claims." *Id.* ¶ 32(B), Pl.'s App. at 92. The two pending *Thiokol* cases would also be dismissed with prejudice. *Id.* The agreement then related that the settlement proposal had "been accepted on behalf of the Attorney General." *Id.* ¶ 33. The parties also pledged to execute the separate document, referred to as the "Pension Merger Agreement," which was appended as Attachment 1. *Id.* ¶ 34, Pl.'s App. at 92–93. The Pension Merger Agreement was duly executed by the parties' representatives on December 30, 1997. *See* Attach. 2 to Sett. Agmt., Pl.'s App. at 105.

Paragraph 35 of the Settlement Agreement provided that:

> Upon execution of this Settlement Agreement and the Pension Merger Agreement, Thiokol releases, waives, and abandons all claims relating to PRB Costs and Severance Pay that were asserted in case nos[.] 96–422C and 97–541C, as well as any other claims relating to PRB Costs or Severance Pay that could have been asserted in those cases or in any other action with respect to its activities under the GOCO and facilities use contracts at the Longhorn and/or Louisiana AAPs, including any claims for interest, costs, expenses, or attorney fees, except that this Settlement Agreement shall not cover any incurred but presently unknown Workers' Compensation claims, including those potentially at issue in *Scott, et al. v. Thiokol Corp.*, No. 2:97–CV 151 (E.D. Tex., Marshall Div.), that Thiokol

---

7. For purposes of the agreement, "PRB Costs" were defined as "the costs of PRBs, LTDBs, and WC." Sett. Agmt. ¶ 8, Pl.'s App. at 88.

could not have discovered through the exercise of reasonable diligence.

Sett. Agmt. ¶ 35, Pl.'s App. at 93.

The Settlement Agreement incorporated the Pension Merger Agreement ("PMA") by reference, stating that "all of its terms and obligations shall be considered to be a part of this Settlement Agreement for all purposes." Sett. Agmt. ¶ 34, Pl.'s App. at 93. The PMA used the term "Benefits" to refer to PRBs, LTDBs, WC benefits and severance benefits. Att. 2 to Sett. Agmt., Pl.'s App. at 103. One of the prefatory clauses of the PMA read, "Thiokol has determined ... and the [Corporate Administrative Contracting Officer of the Defense Logistic Agency's Defense Contract Management Command] has verified, that Ordnance Benefits liabilities exceed Benefits assets ('Benefits Deficit') (*see* attached Schedule A)." Att. 2 to Sett. Agmt. at 2, Pl's App. at 104. The next clause of the PMA stated that "both Thiokol and the United States wish to resolve whatever rights and obligations of the parties may exist, if any, due to the existence of the Ordnance Pension Surplus and the Ordnance Benefits Deficit." *Id.* Among other things, the parties then agreed:

> The United States waives all right, title and interest that it may have in the Ordnance Pension Surplus or to any contract costs or price adjustment pursuant to CAS § 9904.413–50(c)(12) and, in return for such waiver, Thiokol relinquishes and waives all its current and future rights to seek reimbursement from the United States for the Ordnance Benefits Deficit (with the exception of incurred, but presently unknown workers' compensation claims, including those potentially at issue in the *Scott v. Thiokol,* toxic tort litigation, No. 2:97–CV–151 (E.D. Tex., Marshall Div.), and any other such claims that have not yet been asserted and which Thiokol could not have discovered through the exercise of reasonable diligence).

PMA ¶ 3, Pl.'s App. at 104.

The PMA included an attachment, Schedule A, which was referenced twice in the PMA—as readers were told to "*see* attached Schedule A" to support the clause stating that Ordnance pension assets have been determined and verified to exceed pension liabilities, and, as was noted above, to support the clause stating "that Ordnance Benefits liabilities exceed Benefits assets." Att. 2 to Sett. Agmt. at 1–2, Pl's App. at 103–04. Schedule A contains the heading "LONGHORN/LOUISIANA GOCO PLANTS SETTLEMENT OF EMPLOYEE BENEFIT LIABILITIES (Assets and Liabilities Measured as of the Segment Closure on 6/30/97)." Att. 2 to Sett. Agmt. at 5, Pl.'s App. at 107. The first three lines of the schedule show pension assets of $109,934,889, pension liabilities of $63,194,836, and a resulting surplus of $46,740,053. *Id.* The next four lines show PRB liability of $36,776,715, based on "Post–6/30/97 PRB Liability" of $34,720,948, "Pre–7/1/97 PRB Liability" of $6,055,692, and "PRB Assets" of $3,999,925. *Id.* The next three lines of the schedule show the liabilities for LTDBs, and WC and severance costs, with a resulting "TOTAL ORDNANCE BENEFITS DEFICIT" of $48,915,749, and a bottom line of a $2,175,696 "TOTAL REMAINING UNFUNDED LIABILITY"— derived by subtracting the Ordnance Benefits Deficit from the Ordnance Pension Surplus. *Id.*

On January 6, 1998, the parties filed stipulations dismissing with prejudice *Thiokol I* and *Thiokol II,* and these two prior cases were dismissed that day. *See* Def.'s App. at 22–25.

### E. ATK/Thiokol Seeks Reimbursement for PRBs for Fiscal Years 1996 and 1997

After the settlement was executed, the Army and ATK/Thiokol continued working to close out the contracts relating to the AAPs. At a meeting in the spring of 1998, the vice president and director of contracts for the plaintiff asked the CO whether the Army would be reimbursing the plaintiff for the portion of PRB costs that corresponded to the Army's share of the plaintiff's business base. *See* Jacobs Decl. ¶ 54, Pl.'s App. at 21; Adams Decl. ¶ 16, Def.'s App. at 31. The CO "informed the Thiokol representatives that the Army would not pay any additional PRB costs because all PRB costs were included in the December 1997 Settlement Agreement"

and added "that we would not discuss PRB costs again, because all PRB costs had been resolved by the Settlement Agreement." Adams Decl. ¶ 16, Def.'s App. at 31; *see* Jacobs Decl. ¶ 54, Pl.'s App. at 21 (confirming substance of CO's statement).

More than one year later, an officer of ATK/Thiokol sent a letter to the Army stating that:

> over the past few months a new challenge has arisen relative to the PRB settlement reached in December 1997. There appears to be some question as to whether or not $2,722,709 in PRB related costs for fiscal years 96 and 97 were, or were not, part of the December 1997 PRB settlement between the government and Thiokol.

Pl.'s Ex. 37 (Sept. 2, 1999 Tidwell ltr.), Pl.'s App. at 794. Plaintiff took the position "that this specific $2,722,709 was not in dispute during the PRB settlement negotiation process and should be paid." *Id.* In the letter, ATK/Thiokol explained its view that the settlement only applied to PRB costs that were disputed between the parties, and thus did not affect the Army's liability for the percentage of PRB costs corresponding to the Army share of plaintiff's business base for any given year. It referred to the latter as "open financial reconciliations remaining to be addressed," and characterized the settlement as "the disputed cost settlement." *Id.* ATK/Thiokol pointed out that "the government position employed to ascertain the amount of PRB costs actually in dispute recognized the $2,722,709 as a legitimate PRB cost." *Id.* It referenced an attached excerpt from the PRB Recap showing how the $6,055,692 figure representing "Pre–7/1/97 PRB Liability" on Schedule A to the PMA was derived: by taking its total PRB costs for fiscal years 1996 and 1997 and subtracting what it calculated to be government's position on PRB costs that would be reimbursable for fiscal years 1996 and 1997. *See id.* at 794–95; *see also id.* at 817, 819. This position alleged to be the government's—that nineteen percent of fiscal year 1996 and sixty-six percent of fiscal year 1997 costs were allocable to the Army—resulted in the calculation that the Army's share of PRB costs

was $3,736,435, of which $1,013,726 had already been paid prior to the conclusion of the settlement process, leaving $2,722,709 due plaintiff from the Army.[8] *See id.* at 819. ATK/Thiokol requested "written clarification of the government's position in this matter" and informed the Army that it planned to submit an invoice for the identified amount within forty-five days. *Id.* at 795.

The CO responded the next month, confirming that the Army's position was that "[a]ll PRB costs for Longhorn and Louisiana were settled in the December 1997 agreement, and Thiokol waived its right to seek any additional reimbursement for PRBs." Pl.'s Ex. 38 (Oct. 4, 1999 Adams ltr.), Pl.'s App. at 823. She quoted from paragraphs twenty-seven and thirty-five of the Settlement Agreement, emphasizing the portions stating that the parties intended to resolve "any other claims or potential claims regarding PRB Costs ... that may have arisen from Thiokol's performance under the GOCO contracts and facilities use contracts" and that plaintiff released, waived and abandoned "any other claims relating to PRB Costs or Severance Pay that could have been asserted in those [prior] cases or in any other action with respect to its activities under the GOCO and facilities use contracts." *Id.* at 824 (quoting from Sett. Agmt. ¶¶ 27, 35). At a meeting later that month, ATK/Thiokol representatives again raised the issue of the fiscal year 1996 and 1997 PRB Costs, and were told by the CO that the claims were settled and would be discussed no further. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 94; Aldredge Decl. ¶ 120, Pl.'s App. at 65; *see also* Adams Decl. ¶ 17, Def.'s App. at 31–32.

On November 15, 1999, ATK/Thiokol submitted a certified claim for $2,722,709 for reimbursement of these fiscal year 1996 and 1997 PRB costs. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 95; Pl.'s Ex. 40; Def.'s App. at 202–37. It enclosed a copy of the September 2, 1999 letter to the Army, *see* Pl.'s Ex. 40, Pl.'s App. at 871–99 (Sept. 2, 1999 Tidwell ltr. and attachments), and argued that "[t]he release upon which [the CO relies] to support [her] position that the government has no payment obligation is contrary to the mutual-

8. These amounts have been rounded to the nearest whole dollar.

ly intended scope of the release." *Id.,* Pl.'s App. at 865. On January 13, 2000, the CO denied the claim. Pl.'s Ex. 41, Pl.'s App. at 900–05; Def.'s App. at 238–43. She explained that the document that ATK/Thiokol relied upon, from its PRB Recap, which "purports to show that the Government's position was that Thiokol was owed $2.7 million for PRBs ... was prepared by Thiokol, was never agreed to by the Government, and was not included in the settlement agreement." Pl.'s Ex. 41, Pl.'s App. at 902. The CO stated that "in the negotiations, the parties undertook to resolve all PRB costs for the two facilities." *Id.* She pointed out that the Settlement Agreement "clearly states the intent of the parties to resolve all PRB costs," citing paragraph twenty-seven of the agreement. *Id.,* Pl.'s App. at 903. The CO also quoted from paragraph thirty-five of the Settlement Agreement, describing the release and waiver of PRB claims relating to the GOCO and facilities use contracts for the two facilities. *Id.,* Pl.'s App. at 904. She concluded that "[a]ll PRB costs for Longhorn and Louisiana [AAPs] were fully settled between the Government and Thiokol," and that the "PRB costs at issue in this claim were fully considered and taken into account in the prior settlement." *Id.*

The present case was filed in our Court on January 11, 2001, seeking recovery of the $2,722,709 claimed for PRB and LTDB costs incurred in fiscal years 1996 and 1997. Pl.'s Ex. 42 ("Compl."), Pl.'s App. at 906–22. Plaintiff seeks this sum, plus CDA interest, under three separate theories. Count I alleges a breach of the GOCO and facilities use contracts. *See* Compl. ¶¶ 61–71, Pl.'s App. at 917–18. Count II alleges that an implied-in-fact agreement was formed by plaintiff's response to a letter from the CO dated January 3, 1996, in which "the CO directed Thiokol to separate disputed from undisputed PRB Costs and to submit such undisputed costs for payment by allocating such costs through indirect cost rates," *id.* ¶ 73, Pl.'s App. at 919, and that this agreement was breached by non-payment of the fiscal year 1996 and 1997 PRB costs. *See id.* ¶¶ 74–79, Pl.'s App. at 919–20; *see also* Pl.'s Ex. 21 (Jan. 3, 1996 Adams ltr.). In Count III, plaintiff contends that the government is "estopped from disal-

lowing" the PRB costs sought in this lawsuit, Compl. ¶ 90, Pl.'s App. at 921, because the government had been paying its allocated portion of PRB costs while the prior lawsuits were pending and allegedly knew that ATK/Thiokol was excluding the costs at issue in this case from the settlement of the prior lawsuits. *See id.* ¶¶ 80–90, Pl.'s App. at 920–21.

The government has moved for summary judgment, arguing that the plain and unambiguous language of the Settlement Agreement bars consideration of the claims at issue, and that undisputed extrinsic evidence confirms that the settlement did not exclude these claims from the scope of claims released and waived. Plaintiff has cross-moved for partial summary judgment, contending that the plain language of the Settlement Agreement excluded these claims from the settlement, and that this is confirmed by the circumstances and actions of the parties— including the Army's payment, subsequent to the execution of the Settlement Agreement, of vouchers that included other PRB costs.

## II. DISCUSSION

### A. Applicable Legal Standards

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Although the Court has before it cross-motions for summary judgment, it does not necessarily follow that one side or the other must prevail at this stage of the litigation, since material facts may be disputed; rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party

whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

Material facts are those "that might affect the outcome of the suit under the governing law." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. The moving party, however, must file with the Court the documentary evidence, such as exhibits, that support its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548; *see also Anchor Savings Bank, FSB v. United States,* 59 Fed.Cl. 126, 140 (2003).

## B. Principles of Contract Interpretation

Contract interpretation is a question of law. *Calif. Fed. Bank v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001); *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985). Therefore, it is a proper subject for a motion for summary judgment. A contract's terms may, however, be ambiguous, necessitating a review of extrinsic evidence to determine the parties' intent. Under such circumstances, if material facts are genuinely in dispute, summary judgment may not be granted. *See, e.g., Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988); *cf. Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988) (noting "there may be fact questions to resolve in instances of ambiguous contracts" in the context of a motion to dismiss). The question of whether a contract is ambiguous is a question of law. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996); *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) ("Contract ambiguity is a question of law."). A contract term is unam-

biguous when there is only one reasonable meaning; conversely, "if more than one meaning is reasonably consistent with the contract language it can not be deemed unambiguous." *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir. 1993). However, "[c]ontracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to their meaning." *Southern Constr. Co. v. United States,* 176 Ct.Cl. 1339, 1361, 364 F.2d 439 (1966). Moreover, "an interpretation which is merely possible is not necessarily reasonable." *Ceccanti, Inc. v. United States,* 6 Cl.Ct. 526, 528 (1984).

In interpreting a contract, the Court attempts to "accomplish the intention of the parties." *In re Binghamton Bridge,* 3 Wall. 51, 70 U.S. 51, 74, 18 L.Ed. 137 (1865). The Court's purpose is not to create a new contract for the parties. *Lowber v. Bangs,* 2 Wall. 728, 69 U.S. 728, 738, 17 L.Ed. 768 (1864) (rejecting a possible interpretation of disputed contract stating that "[s]o to hold, we think, would be to make a new contract for the parties, and not to execute the one they have made"). It is merely to interpret the existing contract in such a way as to give meaning to all the provisions of the contract in light of the parties' intent at the time they entered the agreement. Thus, in interpreting a contract, courts prefer "an interpretation which gives a reasonable meaning to all parts [of the contract] ... to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855 (1978).

The first step in contract interpretation is to determine whether the contract, or the provision at issue, is clear on its face. "It is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972 (1965). In other words, where the language of the contract is clear and unambiguous "the words of those provisions must be given their plain and ordi-

nary meaning by the court in defining the rights and obligations of the parties." *Hyman Constr. Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir.1987) (quoting *Elden v. United States,* 223 Ct.Cl. 239, 252, 617 F.2d 254 (1980)); *accord McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996). Therefore, if the contract is clear on its face, this Court's interpretation of the contract is at an end. *McAbee Constr., Inc.,* 97 F.3d at 1435.

■ If a contract term does not have a plain meaning, it is ambiguous, and the Court must then determine whether the ambiguity is patent or latent. *See L. Rosenman Corp. v. United States,* 182 Ct.Cl. 586, 589–90, 390 F.2d 711 (1968); *see also Emerald Isle Elec., Inc. v. United States,* 28 Fed. Cl. 71, 72–73 (1993) (describing the distinction between patent and latent ambiguities in terms of two policies of risk allocation). A patent ambiguity in a contract is one that is, on its face, glaring and obvious. This has been described as encompassing "an obvious omission, inconsistency, or discrepancy of significance," *Beacon Constr. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501 (1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874 (1963). The Court must determine whether a reasonable person would find the ambiguity to be patent and glaring, on an *ad hoc* basis. *L. Rosenman Corp.,* 182 Ct.Cl. at 590, 390 F.2d 711; *see also Newsom v. United States,* 230 Ct.Cl. 301, 304, 676 F.2d 647 (1982). A contractor may not rely on its own interpretation of patent ambiguities, but instead has a duty to seek a clarification from the government. *See P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355 (Fed.Cir.2002); *Newsom,* 230 Ct.Cl. at 304, 676 F.2d 647; *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 496, 346 F.2d 962 (1965). A bidder who does not inquire into a patent ambiguity assumes the risk for any unanticipated costs incurred as a result. *Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 827, 442 F.2d 930 (1971); *Dynamics Corp. of Am. v. United States,* 10 Cl.Ct. 275, 280 (1986).

■ If not found to be patent, then an ambiguity is latent. The Court will adopt a contractor's reasonable interpretation of a latent ambiguity under the contra proferentem rule—construing an ambiguity against the drafter. *See Newsom,* 230 Ct.Cl. at 303–04, 676 F.2d 647; *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947); *see also United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). If the contractor's interpretation of such a contract provision is determined to be reasonable, *see P.R. Burke Corp.,* 277 F.3d at 1355–56, the contractor will prevail against the author of the contract. *See, e.g., Underground Const. Co. v. United States,* 16 Cl.Ct. 60, 69 (1988); *Reliable Bldg. Maint. Co. v. United States,* 31 Fed.Cl. 641, 644 (1994) (citing *Newsom,* 230 Ct.Cl. at 303, 676 F.2d 647).

■ In order for this Court to determine whether the contractor's interpretation of the contract provision is reasonable, "the court must put itself in the place of a reasonable and prudent contractor." *Neal & Co. v. United States,* 19 Cl.Ct. 463, 473 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991). The Court will employ the ordinary meaning of the words used in an agreement unless there is evidence that the parties meant otherwise-for instance, through the adoption of a special definition. *See Hol–Gar Mfg.,* 169 Ct.Cl. at 390, 351 F.2d 972. In interpreting some words, however, "the context and intention [of the parties] are more meaningful than the dictionary definition." *Rice v. United States,* 192 Ct.Cl. 903, 908, 428 F.2d 1311 (1970).

## C. Interpreting the Settlement Agreement

■ This case presents a difficult question of contract interpretation, complicated by the subsurface presence of confusing jargon, complex benefits concepts, and esoteric accounting issues—as the background section, above, can attest. The difficulty is compounded by the parties' squabbling over the use of terms, best exemplified by the plaintiff's insistence in describing the proportion of benefits costs that corresponded to the Army's percentage of its business base as the "Fair Share PRB Costs," and the govern-

ment's refusal to adopt this somewhat-loaded label. *See, e.g.,* Def.'s Opp. & Reply at 5 n. 3; Def.'s Resp. to Pl.'s Prop. Findings ¶ 30.[9] But merely because interpretation is attended with some difficulty does not mean that a contract is ambiguous, as a careful review of the language relevant to these proceedings confirms.

This case has resulted from the manner in which ATK/Thiokol calculated and presented figures representing post-retirement benefits that had already been earned by its employees—known as "prior service" or "past service" liabilities. As was recounted above, in July 1996, plaintiff filed a lawsuit seeking, among other things, an award of PRB benefits earned and owing to employees who worked on the GOCO contracts at the two ammunition plants. For purposes of that complaint, the present value of these benefits was estimated as of June 30, 1995. *See* Def.'s App. at 119, 137 (Compl. ¶¶ 4, 130). But for the settlement negotiations, when plaintiff compared the size of its pension plan surplus to that of its employee benefits liabilities for the two plants, it initially calculated the latter using the present value of future benefit payments as of June 30, 1997. *See* Pl.'s Ex. 32, Pl.'s App. at 604; Def.'s App. at 269, 286. When ATK/Thiokol's accountants added in the prior service costs incurred between July 1, 1995 and June 30, 1997—that is, the prior service benefits paid or amortized during those two fiscal years-they apparently reduced these costs by $2,722,709. *See* Pl.'s Ex. 5, Pl.'s App. at 110. This reduction allegedly was calculated by determining the Army's share of the business base for each of the two fiscal years in question, multiplying these percentages by the total amount of prior service PRB costs incurred in each year, and then subtracting amounts already reimbursed by the Army as indirect costs. *See id.; see also* Aldredge Decl. ¶¶ 68–71, 77, Pl.'s App. at 49–51, 52.

ATK/Thiokol argues that this sum of $2,722,709 was expressly excluded from the Settlement Agreement. It contends that the language of the Settlement Agreement, including the Pension Merger Agreement expressly incorporated by reference, is clear that only "disputed" PRB liabilities were released, waived, and abandoned. *See, e.g.,* Pl.'s Cross–Mot. & Opp. at 17–21; Pl.'s Reply at 9–12. Since the Army never denied that it owed the portion of incurred PRB costs that corresponded to its share of plaintiff's business base, plaintiff argues, these portions were thus "undisputed," and accordingly could not have been affected by the settlement. *See* Pl.'s Reply at 10–12; Pl.'s Cross–Mot. & Opp. at 19–20; Pl.'s Supp. Br. at 17–19. ATK/Thiokol further maintains that the circumstances surrounding the settlement, and the government's actions in paying some "undisputed" PRB costs before and after the settlement, confirm that the language of the Settlement Agreement does not bar recovery of the amounts sought. *See* Pl.'s Cross–Mot. & Opp. at 25–29.

The government argues that the broad language of the Settlement Agreement unambiguously released and waived recovery of all PRB costs, including those at issue in this matter, and that the actions of plaintiff's representatives during settlement negotiations confirm this. *See, e.g.,* Def.'s Mot. at 5–8; Def.'s Opp. & Reply at 4–12, 14–22; Def.'s Supp. Br. at 11–14. Defendant also maintains that its conduct subsequent to the execution of the Settlement Agreement does not undermine its interpretation of the agreement. *See* Def.'s Opp. & Reply at 23–28. To resolve this disagreement, the Court first turns to the language of the Settlement Agreement.

Since this matter revolves around whether certain claims for reimbursement of costs were released in a settlement agreement, the paragraph from the agreement concerning release and waiver is of paramount importance. As was noted above, this paragraph states:

> Upon execution of this Settlement Agreement and the Pension Merger Agreement,

---

**9.** A provision of the Federal Acquisition Regulations ("FAR") concerning "[a]bnormal or mass severance pay" references the government's "obligation to participate, to the extent of its *fair share*" in reimbursement of actual payments to former employees, but not in accruals. 48 C.F.R. § 31.205–6(g)(5) (emphasis added); *see also* Def.'s App. at 81 (Jan. 3, 1996 Adams ltr. quoting language).

Thiokol releases, waives, and abandons all claims relating to PRB Costs and Severance Pay that were asserted in case nos[.] 96–422C and 97–541C, as well as any other claims relating to PRB Costs or Severance Pay that could have been asserted in those cases or in any other action with respect to its activities under the GOCO and facilities use contracts at the Longhorn and/or Louisiana AAPs, including any claims for interest, costs, expenses, or attorney fees, except that this Settlement Agreement shall not cover any incurred but presently unknown Workers' Compensation claims, including those potentially at issue in *Scott, et al. v. Thiokol Corp.*, No. 2:97–CV 151 (E.D. Tex., Marshall Div.), that Thiokol could not have discovered through the exercise of reasonable diligence.

Sett. Agmt. ¶ 35, Pl.'s App. at 93. The critical interpretive question is the scope of the "claims" that were "release[d], waive[d], and abandon[ed]" through this agreement. ATK/Thiokol maintains that the term "claims" in paragraph thirty-five and elsewhere in the Settlement Agreement, is a term of art in government contracts law that refers specifically to Contract Disputes Act claims.[10] Pl. Cross–Mot. & Opp. at 17. The government disagrees with this narrow definition of "claims" and asserts that it would create internal contradictions within paragraph thirty-five and throughout the Settlement Agreement. Def. Opp. at 7. In interpreting "claims," plaintiff also focuses on terms it believes have the effect of limiting the settlement to the release of costs other than those sought in this lawsuit—including the calculation of "all such known claims" to total $48,915,749, see Sett. Agmt. ¶ 27; the number $2,175,696 given to the "balance of those claims" over the pension fund surplus, see id. ¶ 32(B)(2); and the term "Ordnance Benefits Deficit" used in the PMA. See PMA ¶ 3, Pl.'s App. at 104; see Pl.'s Cross–Mot. & Opp. at 3–4, 21–23, 25.

But before scrutinizing any language which purportedly limits the definition of "any other claims relating to PRB Costs or Severance Pay that could have been asserted in *[Thiokol I* and *Thiokol II]* or in any other action," Sett. Agmt. ¶ 35, Pl.'s App. at 93, the Court finds it necessary to first determine exactly what claims *were* asserted in the prior litigation. After all, the parties were indisputably settling "all claims relating to PRB Costs and Severance Pay that were asserted in case nos. 96–422C and 97–541C." *Id.*[11] As was discussed above, PRB costs were sought in *Thiokol I*—that is, case no. 96–422C. *See* Def.'s App. at 116, 119. Interpretation of the Settlement Agreement thus requires interpretation of the complaint in case no. 96–422C. *See, e.g., Ed. Zueblin, A.G. v. United States,* 44 Fed.Cl. 228, 233 (1999) (holding that "it is appropriate for the court to consider" a document "referenced on the face of" a settlement agreement "in ascertaining the intent of the parties").

### 1. The Claims Relating to PRB Costs Asserted in Thiokol I

In *Thiokol I*, the plaintiff sought "the Army's payment for those benefit costs at the GOCO plants that remain unpaid by the Army." Def.'s App. at 116 (Compl., preliminary statement). ATK/Thiokol explained that over the prior "several years the Army sought aggressively to avoid altogether its liability to Thiokol." *Id.* at 117. By terminating the facilities contracts as of June 30, 1997, it was alleged, "the Army has attempted to walk away from its obligation to pay Thiokol for those costs" of employee benefits at issue. *See id.* at 118. Plaintiff sought "[t]he present value of PRB, LTDB and WC liabilities earned by Thiokol employees while working under the GOCO contracts, and claimed by Thiokol in its January 16 and 17, 1996 claims" denied by the CO. *Id.* at 141 (Compl.¶ 158). It requested "the $39,354,151 of allowable direct costs for past service PRB, LTDB and WC liabilities that arose as

---

10. By Contract Disputes Act claims, Thiokol means a "claim" as defined by 48 C.F.R. § 33.201 as that section read at the time of the Settlement Agreement (the parties acknowledge, see Joint Stip. (May 27, 2004) at 1, that this definition has since been moved to 48 C.F.R.

§ 2.101). *See* 48 C.F.R. § 33.201 (1997); 48 C.F.R. § 2.101 (2005).

11. Unless, that is, the scope of "claims" settled is restricted or limited by other terms of the settlement, which is discussed below.

a result of Thiokol's performance under the GOCO contracts." *Id.* at 143 (Compl. ¶ 169). This sum is the result of adding the amounts requested in the CDA claims that were filed on January 16 and January 17, 1996. *See id.* at 119 (Compl. ¶¶ 4–5) (reciting claims for $38,377,588 and $976,563); *see also* Pl.'s Exs. 22 & 23. This amount was also included among the damages sought under the breach of contract counts contained in *Thiokol I.*[12]

As the *Thiokol I* complaint explained, the January 16, 1996 CDA claim was "based on the present-value amount, as of June 30, 1995, of PRB, LTDB and WC benefit costs incurred as a result of Thiokol's long-term operation of the GOCO plants." Def.'s App. at 137 (Compl. ¶ 130). Looking to that certified CDA claim, ATK/Thiokol had requested $38,377,588, which it described as "the present value of the accrued [PRB, LTDB and WC] liabilities as of June 30, 1995," which "necessarily excludes any liability liquidated by benefit payments made prior to that date whether or not reimbursed by the government." Pl.'s Ex. 22, Pl.'s App. at 516–17. It is quite clear that this claim was for "past service" PRB liabilities—that is, to cover the costs of benefits already earned. *See, e.g., id.* at 520 (plaintiff stating "its position that it is entitled to recover the cost of the PRB, LTDB and WC liabilities *that accrued under* the GOCO contracts") (emphasis added); *id.* at 524 (seeking "to recover the cost of the PRB, LTDB and WC liabilities *that accrued during the performance of* the GOCO contracts") (emphasis added). That CDA claim expressly "result[ed] from the government's rejection" of ATK/Thiokol's August 31, 1995 proposal for interim funding of fiscal year 1996 PRB costs and for an Advance Agreement to fund past service liabilities owed after June 30, 1996. *See id.* at 517. The claim incorporated the August 31, 1995 proposal by reference. *Id.; see also id.* at 524 (explaining that the $38,377,588 figure "represents the present value of the PRB and LTDB and WC 1996 retrospective ad-

justment liabilities that accrued under the performance of the [GOCO] contracts" and citing the August 31, 1995 proposal for derivation of the figure).

To understand the claims raised in *Thiokol I*, then, it is necessary to look back to the August 31, 1995 proposal, which is the root of the relevant PRB claims.[13] In this proposal, ATK/Thiokol sought interim funding to cover the estimated costs of past service PRBs, LTDBs, and WC payments to be incurred during the period from July 1, 1995 through June 30, 1996. *See* Pl.'s Ex. 16, Pl.'s App. at 480. This was estimated on a cash basis, *see id.* n. 3, and comprised the payments made for benefits of former employees who had retired prior to February 1, 1993, and payments into the Voluntary Employees Beneficiary Association ("VEBA") trusts, *see id.* at 480 n. 4, to amortize and pre-fund the benefits earned by other employees. *See id.* at 486. These fiscal year 1996 costs were estimated at $5,920,875. *Id.* at 480. ATK/Thiokol also proposed "an Advance Agreement to establish a trust to pay for the liquidation of its prior PRB liability." *Id.* at 496. The amount needed for the trust was valued at $32,456,713 as of June 30, 1996, which plaintiff explained was "[t]he present value at 6/30/96 represent[ing] the estimated lump sum that would be required to fund the remaining liability as of that date." *Id.* at 480 & n. 4.[14] Plaintiff's accounting officer responsible for PRB costs, *see* Aldredge Decl. ¶ 3, Pl.'s App. at 25, stated that "notwithstanding the Army's stated 'fair share' position, Thiokol's proposal anticipated that the Army would agree to provide additional or separate *full funding for all of its prior-service PRB costs.*" *Id.* ¶ 36, Pl.'s App. at 37 (emphasis added).

The August 31, 1995 proposal did not purport to separate disputed from undisputed PRB liabilities, or to have excluded from its calculations the amount of past service PRB

---

12. *See* note 5, *supra,* and the accompanying text.

13. The complaint also sought reimbursement of PRB costs incurred in 1993 and 1994, *see* Def.'s App. at 119, 137, 141 (Compl. ¶¶ 5, 131, 158), which were the subject of the January 17, 1996 certified CDA claim. *See* Pl.'s Ex. 23.

14. It appears that this was an overestimate, as the proposal further elaborated that "[t]his amount will be reduced to the extent of assets in the [VEBA] trusts that are allocable to the" AAP employees. Pl.'s Ex. 16, Pl.'s App. at 480 n. 4.

liabilities corresponding to the percentage of the Army's share of its business base. *See* Jacobs Decl. ¶¶ 20–22, Pl.'s App. at 9–10 (explaining that the Army "formally established" its position that it will only reimburse costs proportional to its share of ATK/Thiokol's current business base in response to the August 31, 1995 request). Nothing in the proposal indicates that ATK/Thiokol was seeking anything less than full funding for its fiscal year 1996 PRB, LTDB, and WC costs. And the Advance Agreement proposal used the present value of future PRB payments as of June 30, 1996—a lump sum that was not reduced by any estimated Army share of the business base. Thus, when ATK/Thiokol submitted its certified CDA claim on January 16, 1996, seeking the same amount of funding that was requested in the August 31, 1995 proposal, this claim was not reduced by any amount of "undisputed" PRB costs.[15]

Tracing this claim from proposal to certified CDA claim to complaint, then, shows that the same sum of $38,377,588 had been requested from beginning to end, representing the costs of PRBs, LTDBs, and WC payments that had been earned prior to July 1, 1995, but were owed on or after that date. This claim represented full funding of these benefits—not reduced by any "undisputed" amount of money plaintiff was counting on receiving from the Army. ATK/Thiokol concedes that the CDA claim included what it terms "fair share" or "undisputed" costs, as this is the basis of its contention that the claim was only "partially denied" by the CO. *See* Pl.'s Prop. Findings ¶ 24; Aldredge Decl. ¶ 45, Pl.'s App. at 40–41; Jacobs Decl. ¶ 24,

Pl.'s App. at 10.[16] But the CO's denial of the January 16 claim stated that the claim was "denied in its entirety." Pl.'s Ex. 29, Pl.'s App. at 591. Although this decision explained that the government was "not denying Thiokol the right to recover the costs in question" but instead was "simply telling Thiokol these costs must be charged to existing, rather than expired, contracts," *see id.*, what was being denied was ATK/Thiokol's non-routine request of lump sum funding for these costs—and plaintiff sought recovery of this same lump sum in the complaint filed in *Thiokol I. See, e.g.,* Def.'s App. at 119, 137, 141, 143 (Compl.¶¶ 4, 8, 130, 158, 169).

The PRB costs that ATK/Thiokol seeks to recover in this case are for a portion of the past (or prior) service PRB costs incurred in fiscal years 1996 and 1997. *See* Aldredge Decl. ¶¶ 64, 70–71, 76–78, 123, 125–26, Pl.'s App. at 47–48, 50–53, 66. These costs did not represent the accrual of additional benefits earned during that time period, which is a different type of costs—the "current service" PRB costs. *See id.* ¶¶ 106, 114, Pl.'s App. at 62–64. But the prior service costs incurred in fiscal year 1996 were the subject of the August 31, 1995 proposal for interim funding, which sought money to cover the payments plaintiff estimated it would make from July 1, 1995 through June 30, 1996 to provide benefits for retirees and to amortize a portion of benefits already earned by other employees. *See id.* ¶ 36, Pl.'s App. at 37; Pl.'s Ex. 16, Pl.'s App. at 480, 485. And the Advance Agreement proposal sought a lump sum amount representing the present value, as of June 30, 1996, of the funds needed to

**15.** In describing the $38,377,588 sought as "the present value of accrued liabilities as of June 30, 1995," Pl.'s Ex. 22, Pl.'s App. at 516, ATK/Thiokol was being somewhat inaccurate. As has been shown, this number appears to be the result of adding $5,920,875—the amount that plaintiff estimated it would pay throughout fiscal year 1996 to liquidate or amortize past service PRB liabilities—to the $32,456,713 which was the estimated present value of past service liabilities owed after June 30, 1996, and measured as of that date. *See* Pl.'s Ex. 16, Pl.'s App. at 480. To determine a present value as of June 30, 1995 using these two numbers, one would at least have to discount the second number for one additional year of investment return, and probably should similarly reduce the first number to reflect the fact that these costs were to be incurred at various times

throughout the fiscal year. *See, e.g.,* Richard Brealey & Stewart Myers, Principles of Corporate Finance 10–38 (1981).

**16.** These statements contradict some of the allegations made in the complaint in this case. Plaintiff alleged that the January 16, 1996 CDA claim sought "payment, in a lump sum, [of] the present value amount of the *disputed* PRB Costs incurred as a result of Thiokol's long-term operation of the GOCO plants," and that this claim "expressly did *not* seek reimbursement of the PRB Costs allocable to Thiokol's then current business base through the indirect cost rates as directed by the CO." Pl.'s Ex. 42, Pl.'s App. at 911–12 (Compl.¶¶ 35, 37).

finance the future liquidation of all remaining past service PRBs. Pl.'s Ex. 16, Pl.'s App. at 480; *see also* Aldredge Decl. ¶ 36, Pl.'s App. at 37 (explaining that proposal anticipated "full funding for all of its prior-service PRB costs"). By definition, then, this lump sum was estimated to cover the PRB benefits paid out in each succeeding year—starting with the fiscal year beginning July 1, 1996. Thus, it appears to the Court that plaintiff did assert, in *Thiokol I,* the very claims plaintiff also brings in this case.

In sum, plaintiff in its August 31, 1995 proposal sought funding for all of its fiscal year 1996 prior service PRB costs, which it estimated to total a certain amount. It also sought a lump sum to pre-fund all prior service PRB costs that were to be paid after June 30, 1996, based on a calculation of the present value of the future costs as of that date. This request was denied, and then formed the basis for the January 16, 1996 certified CDA claim, which sought exactly the same amount requested in the August 31, 1995 proposal, and which ATK/Thiokol concedes sought reimbursement of all prior service PRB costs—including the portion that the Army allegedly was willing to pay.[17] On the basis of the CO's denial of the certified claim, plaintiff then filed *Thiokol I,* which sought, among other things, the exact same amount requested in the August 31, 1995 proposal, and sought in the January 16, 1996 certified claim.

Although it does not state this position particularly clearly, plaintiff appears to suggest that one difference between prior service PRB costs incurred before July 1, 1997, and those that were to be incurred on or after that date, is that the latter were entirely in dispute prior to the filing of the complaint in *Thiokol I.* This state of affairs would stem from the Army's decision to terminate the contracts for the AAPs as of June 30, 1997—as there would no longer be Army contracts to which these could be indirectly charged, and, one supposes, the Army's percentage share of the business base would drop to zero. *See* Pl.'s Prop. Findings ¶ 27. But this event did not have any impact on the description of the amounts claimed in

*Thiokol I.* The complaint did recite that "the Army canceled all further expenditures under the basic ordering agreements and notified Thiokol that the facilities contracts for both the GOCO plants will be terminated effective June 30, 1997." *See* Def.'s App. at 117; *see also id.* at 139–40 (Compl.¶¶ 143–46). Plaintiff did not, however, allege that this made all prior service PRB costs payable after June 30, 1997 "disputed," or draw any distinction at all between those costs and the prior service PRB costs incurred between July 1, 1995 and June 30, 1997.

Instead, the complaint described this component of the claimed damages as being "based on the present value amount, as of June 30, 1995, of PRB, LTDB and WC benefit costs incurred as a result of Thiokol's long term operation of the GOCO plants." Def.'s App. at 119 (Compl.¶ 4). This claim is then combined with others, and described as the "present value of PRB, LTDB and WC liabilities earned by Thiokol employees while working under the GOCO contracts," *see id.* at 141 (Compl.¶ 158), or "the present value of Thiokol's past service PRB and LTDB, WC and severance liabilities that arose through Thiokol's performance of the GOCO contracts." *See id.* at 146 (Compl.¶ 194). Rather than distinguishing between costs that may have been partially acknowledged by the CO and those that were denied and thus disputed, ATK/Thiokol describes its claim as being "for those benefit costs at the GOCO plants that remain unpaid by the Army," *id.* at 116, or for "payment of reimbursable past service liabilities." *See id.* at 138 (Compl.¶ 136). The complaint alleged that the Army "has refused to pay Thiokol the amount of PRB and LTDB accrued liabilities and WC and severance liabilities that arose through Thiokol's performance of the GOCO contracts," *id.* at 146 (Compl. ¶ 195), and then, tellingly, still used the same figures presented in the January 16, 1996 CDA claim—even though the CDA claim was for full funding, including the "undisputed" amounts.

Of course, one difference between the specific amounts claimed in the present lawsuit, and the amounts sought in *Thiokol I,* is that

---

**17.** Thus, plaintiff characterizes the CO's denial as only partial. *See* Pl.'s Prop. Findings ¶ 24.

the claims in the prior litigation that were traceable back to the August 31, 1995 proposal were mere estimates—of either the past service PRB costs to be incurred in fiscal year 1996, or the lump sum needed as of June 30, 1996 to finance past service PRB benefits yet to be paid. The amount sought here, on the other hand, is a portion of costs already incurred and thus certain. But the retrospective as opposed to prospective measure of these costs do not make them different claims. The fact that the same costs were sought in *Thiokol I* is confirmed by a close review of the "PRB Recap" documentation that shows how the $2,722,709 in "undisputed" PRB costs was calculated and purportedly excluded from the settlement of *Thiokol I.*

Exhibit B to the PRB Recap was a spreadsheet entitled "PRB Cost In Dispute FY96–97," *see* Pl.'s Ex. 5, Pl.'s App. at 111, that "provided a very detailed breakout of Thiokol's total prior-service PRB costs, allocated by contract and by elements of relevant PRB costs." Aldredge Decl. ¶ 79, Pl.'s App. at 53. Using this spreadsheet, the various costs that went into the calculation of the prior-service PRB costs for fiscal years 1996 and 1997, and then into the alleged "government position" and "in dispute" figures, can be isolated. For instance, the first row of figures shows "Pre 93 Medical" costs—presumably the payments for medical coverage of former employees who had retired prior to February 1, 1993—for fiscal year 1996. Pl.'s Ex. 5, Pl.'s App. at 111. The total amount of these costs was $1,342,355, of which plaintiff calculated that all but $176,627 were disputed. *Id.* The monthly breakdown of this line of costs can be derived from Schedule D–2 to Exhibit D of the PRB Recap, which contains detailed ledger sheets. *See* Aldredge Decl. ¶ 84, Pl.'s App. at 54–55. For fiscal year 1996, these sheets start with ones dated "7/1/95" in a cell in the upper left corner, and end with ones with the word "FINAL" in that cell. *See* Pl.'s Ex. 5 at 210–11, 260–61. The monthly

figures that cumulate to total the "Pre 93 Medical" costs figure contained on the first line of Exhibit B to the PRB Recap, mentioned above, can be found in several places. One place is a box with the heading "Enter Pre 2/93 Information," which contains one line corresponding to "BCBS–LA," another corresponding to "LA VEBA A," and then the monthly bottom line. *See* Pl.'s Ex. 5, Pl.'s App. at 210, 213, 218, 224, 230, 236, 240, 245, 248, 252, 255, 261.[18] The twelve figures on these bottom lines added together result in exactly $1,342,355.26, confirming that these are the source of the figures contained on the fiscal year 1996 "Pre 93 Medical" line on Exhibit B. *See id.,* Pl.'s Ex. 5, Pl.'s App. at 111 (data row one, third column figure under "Total" is $1,342,355).

The "Pre 2/93" medical costs listed on the first three monthly ledgers for fiscal year 1996 (the ones identified as "7/1/95," "8/1/95," and "9/1/95") were, respectively: $128,094.12; $102,796.35; and $115,270.90. *See id.,* Pl.'s App. at 210, 213, 218; *see also id.* at 211, 214, 219. These costs, which were included in ATK/Thiokol's calculation of the fiscal year 1996 prior service PRB costs for purposes of the settlement, and thus figure into the "undisputed" costs at issue in this case, are significant. As was discussed above, after plaintiff submitted its August 31, 1995 proposal seeking interim funding of the prior service PRB costs it expected to incur in fiscal year 1996, no action was taken by the CO for several months. On November 27, 1995, plaintiff submitted a follow-up request, which began:

> In our 31 August 1995 request for increased funding for Post Retirement and Long Term Disability benefits Thiokol identified the need for *interim* funding of these costs for the period of 1 July 1995 to 30 June 1996. For the four months ending October 1995, we have incurred expenses in the amount of $1,788,722.65 for these

18. This figure can also be found on a different ledger sheet, as the bottom line of the "PRE 2/93" column of "MED" costs. *See* Pl.'s Ex. 5, Pl.'s App. at 211, 214, 219, 223, 235, 239, 244, 247, 253, 256, 260. The information in both places is identical. *Compare, e.g., id.* at 218 *with id.* at 219 (the amount $115,270.90 appears in

both places for the report dated September 1, 1995). But Schedule D–2 contains this ledger sheet for only eleven of the months of fiscal year 1996, as the sheet containing the November 1, 1995 data appears to have been omitted from the PRB Recap.

obligations. However, we have received no funding from the Army to reimburse Thiokol for these expenses. A schedule of these expenses by month, type and amount is attached as Exhibit 1.

Therefore, the Contractor again requests that interim funding be immediately made available so that Thiokol can be reimbursed for these expenses, until a long-term resolution can be reached.

Pl.'s Ex. 17, Pl.'s App. at 499. The August 31, 1995 proposal estimated the prior service PRB costs to be incurred in fiscal year 1996 and was the basis for the January 16, 1996 certified CDA claim. This follow-up request identified the actual expenses incurred for the first four months of the fiscal year, and made it clear that "these obligations" and "these expenses" were part of the costs to be funded under the August 31, 1995 proposal. These expenses, then, represented the *actual* counterparts to the *estimated* costs that were used in the August 31, 1995 proposal, and thus in the January 16, 1996 certified CDA claim and the *Thiokol I* complaint. Turning to the attached Exhibit 1 which itemizes these costs, one finds that the "Pre 2/93 Medical" expenses identified for the months of August, September, and October are, respectively: $128,094.12; $102,796.35; and $115,270.90. *Id.*, Pl.'s App. at 500. As these are the identical figures, down to the penny, used in calculating the "disputed" and "government position" PRB costs that have resulted in the present lawsuit, *compare id.*, Pl.'s App. at 500 *with* Pl.'s Ex. 5, Pl.'s App. at 210, 213, 218, it appears beyond doubt that the claims at issue in this case were asserted in *Thiokol I*.[19]

### 2. The Costs at Issue in this Case Are Included in the "Claims" Released

The Settlement Agreement unambiguously provided that plaintiff "release[d], waive[d], and abandon[ed] all claims relating to PRB Costs and Severance Pay that were asserted in case nos[.] 96–422C and 97–541C." Sett. Agmt. ¶ 35, Pl.'s App. at 93. As the Court

has interpreted the complaint in *Thiokol I* and concluded that the full extent of plaintiff's prior service PRB costs incurred in fiscal years 1996 and 1997 were asserted in case no. 96–422C, the plain language of paragraph thirty-five would operate to release and waive these claims.

But even were the Court mistaken in this conclusion—if, by coincidence, the present value as of June 30, 1995 of the future payments of prior service PRBs, LTDBs, and WC payments, reduced by the portion corresponding to the Army's share of plaintiff's business base (which the Court will hereinafter call "the government percentage"), as calculated in July 1996, just happened to equal the $38,377,588 which plaintiff estimated it needed to fully fund all of these costs (including the government percentage), in a certified CDA claim filed just six months prior; or if, by coincidence, the identical figures of $128,094.12, $102,796.35, and $115,270.90 happened to be calculated as the medical expenses incurred, over three successive months, to pay benefits for employees who had retired before February 1, 1993, using the two different criterion of excluding and including the government percentage—the costs at issue in this case would still have been released by the language of paragraph thirty-five.

This conclusion is compelled by the plain language of the paragraph, which also released and waived "any other claims relating to PRB Costs or Severance Pay that could have been asserted in those cases or in any other action with respect to [plaintiff's] activities under the GOCO and facilities use contracts at the Longhorn and/or Louisiana AAPs." Sett. Agmt. ¶ 35, Pl.'s App. at 93. The government takes the reasonable position that "claims" meant the "usual and ordinary meaning" of the term, Def.'s Supp. Br. at 11, which the Federal Circuit has recognized as "a demand for something due or believed to be due." *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1576 (Fed.Cir.1995) (quoting WEBSTER'S NINTH NEW COLLEGIATE DIC-

---

19. Presumably there was a one-month lag in billing due to some accounting convention resulting, for instance, in the amount calculated on the "7/1/95" ledger sheet to be listed as an "AUG" expense in the November 27, 1995 request.

*Compare* Pl.'s Ex. 5. Pl.'s App. at 210 (showing $128,094.12 in medical expenses for employees retiring before February 1, 1993) *with* Pl.'s Ex. 17, Pl.'s App. at 500 (showing this same figure as an August, 1995 expense).

TIONARY 244 (1990)). ATK/Thiokol argues that "claims" is a term of art when used in government contracts, and thus invokes the FAR definition of "claim," which is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract," but does not include a "voucher, invoice, or other routine request for payment that is not in dispute when submitted." Pl.'s Cross–Mot. & Opp. at 17 (quoting 48 C.F.R. § 33.201 (1997)).[20]

The first problem with plaintiff's argument is that the definition of "claim" provided in the FAR is for purposes of those regulations concerning government contracts for the acquisition of supplies and services. The Settlement Agreement was not such a contract, and thus the "technical" definition or "term of art," see Pl.'s Cross–Mot. & Opp. at 17, would not naturally apply. Nor is this definition expressly incorporated by reference. The Settlement Agreement does refer to "claims ... that were asserted in case nos[.] 96–422C and 97–541C," Sett. Agmt. ¶ 35, Pl.'s App. at 93, and since those cases were brought pursuant to the CDA, one could on that basis, perhaps, contend that "claims" must implicitly incorporate the definition that is relevant for CDA purposes.[21] But then a second problem arises, as "claims" is clearly used in the Settlement Agreement in a broader sense than the sums certain demanded as of right as CDA claims. Paragraph thirty-five itself stated that the released claims "includ[ed] any claims for interest, costs, expenses, or attorney fees." Sett. Agmt. ¶ 35, Pl.'s App. at 93.

A third difficulty with plaintiff's equation of "claims" with "CDA claims" is plaintiff's simultaneous contention that no CDA claim existed at the time of settlement concerning *any* of the prior service PRB costs incurred in 1996 and 1997, disputed or not. *See* Pl.'s Reply at 11–12 & n. 10. If the $6,055,692 in "disputed" prior service PRB costs incurred

during those fiscal years "were never the subject of a CDA claim," *id.* at 12 n. 10, then they could not "have been asserted ... in any other action" as a claim under the CDA, not having been denied (or deemed denied through inaction) by the CO. *See* 41 U.S.C. §§ 605(c), 609(a). Yet this amount was clearly included among the plaintiff's "claims for PRB Costs and Severance Pay," Sett. Agmt. ¶ 32(B)(1), that were released via the Settlement Agreement. ATK/Thiokol unsatisfactorily tries to explain away this inconsistency by redefining "claims" to mean merely "something in dispute," Pl.'s Reply at 12 n. 10, dropping the portion of the definition requiring "a written demand or written assertion." *See* Pl.'s Cross–Mot. & Opp. at 17. Thus—although this is far from clearly stated—it appears that, to plaintiff, "claims" does not mean "CDA claims" after all, but rather disputed amounts; and claims that "could have been asserted" in an action means potential claims that could have been the subject of a CDA claim, rather than actual CDA claims denied by a CO.

To this end, plaintiff elaborates on the meaning of "potential claims." *See* Pl.'s Supp. Br. at 10, 18–19. This term is of some significance, as the Settlement Agreement explained that the parties:

> entered into negotiations *intended to resolve all* of Thiokol's claims regarding PRB Costs and Severance Pay, including both those that had been asserted in cases nos[.] 96–422C and 97–541C and also any other claims or *potential claims* regarding PRB Costs and Severance Pay that may have arisen from Thiokol's performance under the GOCO contracts and facilities use contracts at the Longhorn and Louisiana AAPs.

Sett. Agmt. ¶ 27, Pl.'s App. at 90 (emphases added). ATK/Thiokol seems to argue that a *dispute* over a sum certain demanded as of right makes that sum certain a potential claim. It notes that the government percentage of prior service PRB costs incurred in

---

**20.** The quoted provision has since been moved to 48 C.F.R. § 2.101. *See* note 10, *supra*.

**21.** Similarly, "claims ... with respect to [plaintiff's] activities under the GOCO and facilities use

contracts," Sett. Agmt. ¶ 35, Pl.'s App. at 93, could imply the incorporation of the CDA definition.

1996 and 1997 was the subject of routine vouchers and invoices requesting payment as a portion of indirect costs relating to the contracts, which were pending and not disputed at the time of settlement. *See* Pl.'s Supp. Br. at 17–19. The FAR definition of "claim" states that a "voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim," but explains that "[t]he submission may be converted to a claim, by written notice to the contracting officer . . . if it is disputed either as to liability or amount or is not acted upon in a reasonable time." 48 C.F.R. § 2.101. From this, plaintiff concludes that a routine request for payment "becomes a potential claim only after a dispute exists." Pl.'s Supp. Br. at 10. Since the PRB costs requested in the vouchers and invoices were allegedly not in dispute, then, according to plaintiff these never were "potential claims," *see id.* at 12, 18–19—in contrast, presumably, to the $6,055,692 that was disputed.

The problem with this particular argument, though, is that the Federal Circuit has expressly rejected the disputed/undisputed dichotomy in interpreting the FAR definition of "claim." *See Reflectone*, 60 F.3d at 1577. While a pre-existing dispute may be required for a routine request for payment to be a *claim* under the CDA, this does not mean that the sum requested does not represent a *potential claim*. In *Reflectone*, the Federal Circuit recognized that "undisputed routine requests for payment" are a "categor[y] of potential claims." *Id.* More to the point, it held that when a non-routine request for payment is submitted, the FAR definition of claim "simply does not require that entitlement to the amount asserted in the claim or the amount itself already be in dispute when the document is submitted." *Id.* at 1575–76. "Under the literal language of the FAR," the Court explained, "the critical distinction in identifying a 'claim' is not between undisputed and disputed submissions, but between routine and non-routine submissions." *Id.* at 1577.

Thus, whether or not the government percentage of the prior service PRB costs incurred in 1996 and 1997 was disputed is irrelevant in deciding whether this sum represented a potential claim under the CDA.

Since this sum certain could have been the subject of a non-routine request for payment, it could have been demanded in a CDA claim submitted to the CO, and thus was as much a "potential claim" under the CDA as was the $6,055,692 that was in dispute. Moreover, even when embodied in a routine request that was not yet in dispute, this sum represented a "potential claim" since it could have become disputed, and then be converted into a claim by providing the CO with the appropriate written notice. *See* 48 C.F.R. § 2.101. If ATK/Thiokol's interpretation of "claim" as meaning matters that may be included in a CDA claim is correct, then, the amount at issue in this case would still be among the claims released in the Settlement Agreement.

The Court does not find plaintiff's interpretation of these terms to be reasonable, however, for the reasons already given, and one additional reason. Under ATK/Thiokol's interpretation of "claims," the following exception from paragraph thirty-five would be pointless:

> [T]his Settlement Agreement shall not cover any incurred but presently unknown Workers' Compensation claims, including those at issue in *Scott, et al. v. Thiokol Corporation*, No. 2:97–CV–151 (E.D. Tex., Marshall Div.), that Thiokol could not have discovered through the exercise of reasonable diligence.

*Id.* Courts are, of course, to avoid interpretations that render portions of a contract "useless, inexplicable . . . insignificant, meaningless, [and] superfluous." *Arizona*, 216 Ct.Cl. at 235–36, 575 F.2d 855. This would be the result of plaintiff's interpretation of "claims," for an unknown claim can hardly be the subject of a written demand for payment of a sum certain, non-routine or otherwise. Moreover, the term "claims" was used elsewhere in the Settlement Agreement in a manner that conflicts with ATK/Thiokol's interpretation. Paragraph twenty-eight, in which the *Scott* litigation is first mentioned, stated that *Scott* "may result in as yet unknown WC claims the amount of which cannot currently be determined," and added that plaintiff was "currently unaware of any other potential WC claims that might arise from its

operation of the" two AAPs. Sett. Agmt. ¶ 28, Pl.'s App. at 91. Again, "unknown" claims or claims of which a party is "unaware" cannot be the subject of a CDA claim submitted to a CO. The government supplies the only reasonable interpretation of "claims," in light of the term's various appearances throughout the Settlement Agreement—the "ordinary" meaning, "a demand for something due or believed to be due." *See* Def.'s Supp. Br. at 11 (quoting *Reflectone,* 60 F.3d at 1576). This interpretation must be preferred, as it gives reasonable meaning to all parts of the contract. *See, e.g., United States v. Johnson Controls,* 713 F.2d 1541, 1555 (Fed.Cir.1983).

### 3. Did Other Terms of the Settlement Agreement Operate to Exclude the Costs at Issue?

Plaintiff argues that other terms included in the Settlement Agreement either demonstrate that "claims" was meant to exclude the sum sought in the present lawsuit, or act to limit the scope of the settlement to exclude this sum. *See, e.g.,* Pl.'s Cross–Mot. & Opp. at 3–4, 21–23, 25. ATK/Thiokol contends that the term "Ordnance Benefits Deficit" used in the Pension Merger Agreement, *see* PMA ¶ 3, Pl.'s App. at 104, and the specific dollar amounts given to the calculation of "claims regarding PRB Costs and Severance Pay," Sett. Agmt. ¶ 27, Pl.'s App. at 90, and to the "balance of those claims" net of the pension surplus, which plaintiff agreed "to absorb," *id.* ¶ 32(B)(2), Pl.'s App. at 92, necessarily exclude the $2,722,709 in PRB Costs claimed in this case. *See, e.g.,* Pl.'s Cross–Mot. & Opp. at 15–17, 21–23. The Court does not find that these terms modified or limited the definition of claims released in the Settlement Agreement.

Looking at the first dollar amount, the Settlement Agreement merely states that *"Thiokol has calculated* the value of all such known claims regarding PRB Costs and Severance Pay to be $48,915,749." Sett. Agmt. ¶ 27, Pl.'s App. at 90 (emphasis added). Unlike the Ordnance Operations pension surplus, which is stated to be "the amount of $46,740,053," Sett. Agmt. ¶ 29, Pl.'s App. at 91, the reference to the PRB Costs makes this plaintiff's calculation rather than a certain amount. And while both these numbers

were employed in the paragraph in which Thiokol agreed "to offset the pension fund surplus of $46,740,053 attributable to the Ordnance Operations against an equal value of its claims for PRB Costs and Severance Pay" and "to absorb the $2,175,696 balance of those claims," Sett. Agmt. ¶ 32(B)(1)-(2), Pl.'s App. at 92, that paragraph did not purport to limit the claims released to those two amounts. Indeed, plaintiff concedes that the dollar amount of claims released is not limited to the $48,915,749 calculation, as it "voluntarily withdrew any requests for payment related to" some unpaid, disputed current-service PRB costs "specifically in the amount of $594,349.86, to be consistent with the terms of the Settlement Agreement." Pl.'s Cross–Mot. & Opp. at 28; *see also* Pl.'s Prop. Findings ¶¶ 85–86. These costs were *not* included in the $48,915,749 calculation. *See* Pl.'s Reply at 12 (stating these costs "had been inadvertently left out of the calculation of disputed PRB costs"); *see also* Aldredge Decl. ¶¶ 70, 106, 109. Thus, ATK/Thiokol admits that under the Settlement Agreement it absorbed *more* than the $2,175,696 figure identified. *See also* Pl.'s Ex. 57 (Aldredge Supp. Decl.) ¶ 30, Pl.'s App. at 1261–62.

The term "Ordnance Benefits Deficit" is a part of the Settlement Agreement by incorporation, as it is used in the Pension Merger Agreement. *See* Sett. Agmt. ¶ 34, Pl.'s App. at 93 (stating that all terms of the PMA "shall be considered to be a part of this Settlement Agreement for all purposes"). A preliminary paragraph of the PMA stated "that Ordnance Benefits liabilities exceed Benefits assets," designated this as the "Benefits Deficit," and referenced the "attached Schedule A." Att. 2 to Sett. Agmt., Pl.'s App. at 104. The PMA then stated:

> Thiokol relinquishes and waives all its current and future rights to seek reimbursement from the United States for the Ordnance Benefits Deficit (with the exception of incurred, but presently unknown workers' compensation claims, including those potentially at issue in the *Scott v. Thiokol,* toxic tort litigation, No. 2:97–CV–151 (E.D. Tex., Marshall Div.), and any other such claims that have not yet been asserted and which Thiokol could not have discovered

through the exercise of reasonable diligence).

PMA ¶ 3, Pl.'s App. at 104.

Schedule A attached to the PMA contained numbers showing the "Total Ordnance Benefits Deficit" to be $48,915,749. Att. 2 to Sett. Agmt. at 5, Pl.'s App. at 107. According to plaintiff, this defines the Ordnance Benefits Deficit, and confines it to the components listed on Schedule A. *See* Pl.'s Cross–Mot. & Opp. at 21–22. Schedule A derives this figure by adding the Ordnance Operations' pension surplus to PRB assets, and then subtracting what is identified as "Post–6/30/97 PRB Liability," "Pre–7/1/97 PRB Liability," and the liabilities listed for LTDBs, WC payments and severance costs. *See* Att. 2 to Sett. Agmt. at 5, Pl.'s App. at 107. ATK/Thiokol argues that by identifying the "Pre–7/1/97 PRB Liability" as amounting to $6,055,692, Schedule A thereby defines the Ordnance Benefits Deficit as including only this much in PRB costs incurred prior to the contracts' end, and no more. *See* Pl.'s Cross–Mot. & Opp. at 22–23.

Plaintiff's interpretation of the PMA is not reasonable. The "Benefits Deficit" is not defined as being of a particular size, but merely as being the result of liabilities exceeding assets. The reference to Schedule A does not indicate that the Benefits Deficit is expressly limited to the numbers listed, but appears to be for the purpose of confirming that liabilities exceed assets. Indeed, if the "Ordnance Benefits Deficit" concerning which plaintiff "relinquishe[d] and waive[d] all its current and future rights to seek reimbursement" were limited to the dollar figures listed in Schedule A, the express exception for the WC claims in *Scott* and "any other such claims that have not yet been asserted and which Thiokol could not have discovered through the exercise of reasonable diligence," PMA ¶ 3, Pl.'s App. at 104, would be useless, meaningless, and superfluous. Again, such interpretations are to be avoided. *See Arizona*, 216 Ct.Cl. at 235–36, 575 F.2d 855. Moreover, as was discussed above, ATK/Thiokol acknowledges that the Settlement Agreement released more than just the $48,915,749 figure. *See* Pl.'s Cross–Mot. & Opp. at 28 (explaining that an additional

$594,349.86 was also released); *see also* Pl.'s Prop. Findings ¶¶ 85–86. The terms of the PMA did not work to set or limit the amount of PRB costs that was released and waived by plaintiff in the settlement of the prior litigation.

**D. The Release of the Claims at Issue is Confirmed by the Circumstances Surrounding the Settlement of the Prior Litigation**

 Since the Court has found the plain language of the Settlement Agreement to have unambiguously released and waived the claims sought in this lawsuit, "the court's inquiry is at an end, and the plain language of the contract is controlling." *Johnson Controls World Servs., Inc. v. United States*, 48 Fed.Cl. 479, 492 (2001) (citing *Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed.Cir.1998)); *see also HRE, Inc. v. United States*, 142 F.3d 1274, 1276 (Fed.Cir.1998). Extrinsic evidence cannot be considered to create an ambiguity when the language of an agreement is unambiguous. *See Johnson Controls*, 48 Fed.Cl. at 493 (citing *Greco v. Dept. of Army*, 852 F.2d 558, 560 (Fed.Cir. 1988)); *see also McAbee Constr.*, 97 F.3d at 1435; Ed. *Zueblin*, 44 Fed.Cl. at 232–33.

But even were the Court to consider the extrinsic evidence offered to illuminate the circumstances surrounding the settlement of the prior litigation, this evidence actually *confirms* the conclusion that all PRB costs were settled. Rather than showing that "undisputed" payments were omitted from the settlement, the communications from ATK/Thiokol to the Army expressed the intent that all PRB costs be included. For instance, early into the settlement discussions, plaintiff's representative wrote to the government that for purposes of its settlement proposal its "actuaries have calculated the final estimated numbers for both the pension and the employee benefit assets and liabilities," Pl.'s Ex. 32, Pl.'s App. at 595—and no mention is made of any undisputed amounts that will also be reimbursed. *See id.* This letter did at the outset reference "the employee benefit liability issues at Thiokol's Ordnance Operation," *id.*, Pl.'s App. at 594, did parenthetically refer to the "em-

ployee benefit liabilities" as being "in the litigation," *id.*, Pl.'s App. at 595, and also referenced "the liabilities at issue" and the "opportunity to resolve the issues in dispute." *Id.*, Pl.'s App. at 596. But the letter does not express the expectation that some other, undisputed costs existed that were otherwise being reimbursed.

Similarly, in a subsequent letter—sent just before plaintiff realized it had omitted prior service PRB costs incurred prior to July 1, 1997 from its calculations—plaintiff's representative explained that under its settlement proposal the company "would dismiss with prejudice the PRB, LTDB and workers' compensation costs from pending litigation and release *all future claims for such costs.*" Pl.'s Ex. 33, Pl.'s App. at 613 (emphasis added). Its representative further explained that "[t]he government wins by being able to settle the non-pension liabilities with no extra outlay of appropriated funds," noting that "the Army has been greatly concerned over the last several[ ] years that it would have to divert ammunition funds to cover these liabilities of all its GOCO contractors and Thiokol's proposal has been specifically prepared to eliminate that concern." *Id.*, Pl.'s App. at 616. The letter discussed "liabilities," and did not even suggest that there were other PRB costs that plaintiff expected would be separately reimbursed.

At the September 4, 1997 meeting at which plaintiff revealed that it had omitted the costs incurred by its Ordnance Operations in paying or funding PRBs in fiscal years 1996 and 1997, it demonstrated this using a blue and red "Frame of Reference" chart. *See* Def.'s App at 176.[22] This chart employed blue-colored rectangles representing "costs" that were included in the calculations initially used in the settlement discussions, and red-colored rectangles representing "costs" that were not at that time included. *Id.* The vertical axis identified the four categories of costs that were "In Litigation," and points along the horizontal axis included "6/30.95 Claim" and "6/30/97 Proposed Settlement." *Id.* The two red rectangles that purport to represent PRB costs theretofore omitted

from the calculations, apparently incurred prior to the two temporal points just mentioned, were described by the author of the chart as having "included both disputed PRB costs and undisputed PRB costs." Jacobs Decl. ¶ 33, Pl.'s App. at 13; *see* Def.'s App. at 176. Thus, this document communicated to the government that "in litigation" at that time were both "disputed" and "undisputed" PRB costs, even if these sums had been left out of the liabilities calculations used previously in the settlement discussions.

After taking these omitted costs into consideration, ATK/Thiokol's representative wrote to the Army that "pre-July 1, 1997 PRB costs" of $6,055,692 were "the total amount of 'Red' PRB costs that we identified during our discussions and that needed to be inserted into the final settlement arrangement." Pl.'s Ex. 34, Pl.'s App. at 625. As was just noted, plaintiff admits that the "Red Costs identified in the 'Frame of Reference' chart included both disputed PRB costs and undisputed PRB costs." Jacobs Decl. ¶ 33, Pl.'s App. at 13. These were referred to as "incurred, but non-reimbursed, PRB costs," and plaintiff's representative said the amount calculated "open[ed] up an opportunity for the settlement of *all currently known liabilities* at the GOCO plants." Pl.'s Ex. 34, Pl.'s App. at 625 (emphasis added). This letter, then, communicated to the government that *all non-reimbursed PRB costs* were covered in the settlement.

At that same time, ATK/Thiokol also sent the government its "PRB Recap," the background materials showing how it derived the "pre-July 1, 1997 PRB costs," *id.*, that were added to the settlement calculation. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 62. The PRB Recap did describe the $6,055,692 as being "disputed costs," *see* Pl.'s Ex. 5, Pl.'s App. at 110, and showed this figure as having been the result of subtracting what it alleged was the "total due government position" from the "total due Thiokol's position." *Id.* But this document does not state that the "total due government position" amounts were still to be reimbursed to plaintiff. This could easily have been represented—for instance,

---

**22.** Due to a typographical error, the government has numbered two consecutive pages in its ap-

pendix as page 176. The "Frame of Reference" chart is the first of these.

plaintiff could have used the "total due Thiokol's position" figure in its calculations, and offset this by adding the "total due government position" amounts to the calculation of PRB assets, for the same net result. But this was not done in the PRB Recap, nor in the resulting "Schedule A" that was attached to the PMA. *See* Att. 2 to Sett. Agmt. at 5, Pl.'s App. at 107.

In the letter transmitting "the formal proposal" to settle its "unpaid retiree and employee benefit liabilities," plaintiff claimed "that the Army is liable to Thiokol for the reimbursement of $48,975,239 in unpaid post-retirement benefit ('PRB'), long-term disability benefit ('LTDB'), workers' compensation and severance liabilities that arose on or prior to June 30, 1997," and added that "[t]he Army disputes Thiokol's contention that the Army is liable as a matter of law for the reimbursement of these benefit liabilities." Pl.'s Ex. 35, Pl.'s App. at 627. Although this might suggest that only *disputed* liabilities were being discussed, leaving others that the Army would otherwise still reimburse, the letter goes on to counter this suggestion. It explained that "the use of the pension assets and Thiokol's willingness to absorb over $2 million in the remaining unfunded liability as a compromise to achieve settlement, eliminates any need for the Army to expend current year funds." *Id.*, Pl.'s App. at 629. What was proposed was "a final settlement on the four categories of liability (PRB, LTDB, severance, and workers' compensation) relating to the GOCO plants, with the exception of incurred, but presently unknown worker's compensation claims." *Id.* No intent to reserve any portion of its PRB costs from the effect of the settlement was communicated.

And when plaintiff's representative wrote to the government to propose release language, it broadly described what was to be released as "the four *types* of liability expressly covered by the settlement agreement"—with the only exception within these types being the workers' compensation claims from *Scott* or that were not yet known. Pl.'s Ex. 36, Pl.'s App. at 791 (emphasis added). The proposed release drafted by plaintiff stated that:

> Thiokol remises, releases, and discharges the Government, its officers, agents, and employees of and from all civil liabilities, obligations, claims, appeals, and demands which it has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, arising under or in any way related to PRB, LTDB, severance, and workers' compensation costs (exclusive of benefit plan administrative costs) arising under or related to the Contracts. . . .

*Id.*, Pl.'s App. at 793. The only exceptions in the draft were the WC claims in *Scott* and "the cost of presently unknown" WC claims. *Id.* Thus, the extrinsic evidence shows that plaintiff did not communicate to the government any intent to reserve claims for any "undisputed" PRB costs.[23]

### E. The Army Did Not Continue to Consider Payment of these Costs after the Settlement

ATK/Thiokol argues that the Settlement Agreement should be interpreted in light of subsequent conduct by the government, which allegedly continued to reimburse it the government percentage of some other PRB costs. *See, e.g.*, Pl.'s Cross–Mot. & Opp. at 13–14, 25–29; Pl.'s Reply at 14–17. It attempts to preserve its claims under the doctrine that "courts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after execution of a release." *Cmty. Heating*, 987 F.2d at 1581 (citing *Winn–Senter Contr. Co. v. United States*, 110 Ct.Cl. 34, 75 F.Supp. 255 (1948)).

The problem with this argument is that the government did *not* consider paying the claims at issue after the Settlement Agree-

---

**23.** Indeed, to the extent that minds may not have met, it appears that the disconnect was between the accounting officers of ATK/Thiokol and its legal counsel and other officers who agreed to the settlement language. But plaintiff does not argue that it made a unilateral mistake, nor does it seek the corresponding remedy of reformation. *See* Def.'s Mot. at 8–10; *cf. Bromley Contracting Co. v. United States*, 794 F.2d 669, 671–72 (Fed. Cir.1986) (discussing unilateral mistake in the context of a contract bid).

ment was executed. A few months after the settlement was executed, when plaintiff's representatives first raised with the CO the matter of reimbursement of the government percentage of the prior service PRB costs incurred in fiscal years 1996 and 1997, the CO told them the Army would not pay these because all PRB costs had been settled. *See* Jacobs Decl. ¶ 54, Pl.'s App. at 21; Adams Decl. ¶ 16, Def.'s App. at 31. When the matter was broached again, this time in writing over one year later, *see* Pl.'s Ex. 37, Pl.'s App. at 794–95, the CO responded that these costs were settled. *See* Pl.'s Ex. 38. Plaintiff's representatives attempted to raise the issue at a meeting with the CO a few weeks after receiving her written rejection, and were again rebuffed. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 94; Aldredge Decl. ¶ 120, Pl.'s App. at 65; *see also* Adams Decl. ¶ 17, Def.'s App. at 31–32. The relevant government actors had consistently refused to consider paying the claims at issue after the Settlement Agreement was executed. *See also* Pratt Decl. ¶ 15, Def.'s Supp.App. at 517–18.

Under the precedents in this narrow area, evidence of continued, post-settlement consideration of a claim is not used to create an ambiguity in the settlement language where none existed, but rather to show that there was no intent that *the particular claim being considered* was released. *See Cmty. Heating*, 987 F.2d at 1581; *Winn–Senter*, 110 Ct.Cl. at 65–66, 75 F.Supp. 255; *A & K Plumbing & Mech., Inc. v. United States*, 1 Cl.Ct. 716, 723 (1983). Plaintiff cannot show that payment of the costs at issue in this case—the government percentage of the prior service PRB costs incurred in fiscal years 1996 and 1997—was considered by the government after execution of the Settlement Agreement. Instead, it points to *other* PRB costs that apparently went into the calculation of its indirect or overhead costs to establish billing rates for several years of its contracts. These include the current service PRB costs for fiscal years 1996 and 1997—

that is, the PRBs that employees earned by working under the facilities use contracts—and prior service PRBs incurred in fiscal years 1991–95. *See* Aldredge Decl. ¶¶ 103–06, 111–13, Pl.'s App. at 60–63.

Although ATK/Thiokol contends that these are "the same types of PRBs" or "of the same type of PRB costs" as those at issue in this case, *id.* ¶¶ 105, 114, Pl.'s App. at 61, 63–64, they are not the same costs that plaintiff seeks to recover in this case. Moreover, the vouchers submitted for payment of these PRB costs do not themselves state that any PRB costs are included. *See, e.g.,* Def.'s Supp.App. at 520–23 (voucher TF–50), 524–27 (voucher TH–450), 534–37 (voucher TH–499), 543–50 (voucher TH–506). To the contrary, some bear the notation "Excluding PRB Reimbursement issue," *see id.* at 523, 527, 537, and one expressly excludes the very PRB costs sought in this lawsuit. *See id.* at 545 (subtracting as a "questioned cost" the PRB reimbursement of $2,722,708.98). In any event, the payment of vouchers based on indirect costs that have hidden within them other PRB costs, and were based on overhead cost submissions that were filed with the Army well prior to the execution of the Settlement Agreement, *see* Pratt Decl. ¶ 17, Def.'s Supp.App. at 518; Att. 8 to Pratt Decl., Def.'s Supp.App. at 551; Aldredge Supp. Decl. ¶ 45, Pl.'s App. at 1266–67, does not establish that the Army continued to consider payment of the PRB costs at issue in this lawsuit, post-settlement.[24]

**F. The Estoppel Cause of Action**

■ The government moves for the dismissal of plaintiff's third count, which is styled as "Estoppel," *see* Compl. at 15, Pl.'s App. at 920, on the basis that it sounds in promissory estoppel and is thus beyond our Court's jurisdiction. *See* Def.'s Mot. at 15 n. 4 (citing *Gregory v. United States*, 37 Fed.Cl. 388 (1997); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67 (1989); and *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct.

---

24. The Court also notes one distinction between the costs at issue here and the PRB costs reimbursed after the Settlement Agreement was executed—prior service PRB costs incurred in fiscal years 1996 and 1997 were expressly included in the January 16, 1996 CDA claim, but not current service PRB costs or "any liability liquidated by benefit payments made prior to" June 30, 1995. *See* Pl.'s Ex. 22, Pl.'s App. at 516–17.

329 (1983)). In the third count, plaintiff contends that it was directed by the CO to separate out and submit "undisputed" PRB costs for payment, Compl. ¶ 81, Pl.'s App. at 920; that it did so and was reimbursed for these undisputed costs through the submission of vouchers, *id.* ¶¶ 82–85, Pl.'s App. at 920; that it excluded (and informed the government it was excluding) these "undisputed" costs from the settlement of the prior litigation, *id.* ¶¶ 86–87, Pl.'s App. at 920–21; and that it "relied upon the government's actions and inactions to Thiokol's detriment." *Id.* ¶ 89, Pl.'s App. at 921. It seeks as a remedy that the government be "estopped from disallowing the $2,722,709 in indirect costs under the Contracts, rendering the government liable to Thiokol for the amount of $2,722,709, plus CDA interest." Compl. at 16, Pl.'s App. at 921.

ATK/Thiokol argues that Count III amounts to an assertion of equitable, not promissory, estoppel, as it seeks to prevent the government "from raising the defense that the Fair Share PRB Costs at issue here are barred by the Settlement Agreement or are otherwise unallowable as reimbursable costs." Pl.'s Cross–Mot. & Opp. at 29 n. 7. Thus, it is not really a cause of action, but rather a legal argument to disable the government's defense. *See Gregory,* 37 Fed.Cl. at 396 (discussing the difference between the promissory estoppel "sword," which is not within this Court's jurisdiction, and the equitable estoppel "shield"). But as an equitable estoppel argument, plaintiff's "count" is deficient, as it omits a necessary element. The Federal Circuit requires proof of affirmative misconduct by a government agent for estoppel to apply. *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed.Cir.2000); *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir. 1989). Plaintiff has not even alleged such misconduct, much less presented any evidence of it. Accordingly, the "estoppel" count, if considered a cause of action to establish liability, would be beyond our Court's jurisdiction; and, as an argument to thwart the government's defense, is of no avail.

### III. CONCLUSION

For the foregoing reasons defendant's motion for summary judgment is **GRANTED** and plaintiff's cross-motion for partial summary judgment is **DENIED.** The Clerk is directed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**